DECISION AND JOURNAL ENTRY
The Juvenile Division of the Summit County Court of Common Pleas awarded permanent custody of Jammit Davis (d.o.b. 12/16/92) to the Summit County Children Services Board ("CSB"). Charles Davis, the father of Jammit, has appealed from the termination of his parental rights.
Davis has asserted that the trial court erred by denying him his due process right to be heard before his parental rights were terminated. His assignment of error is overruled, and the judgment of the trial court is affirmed.
 I
On approximately March 5, 1996, Davis stabbed his wife Beth Davis with a knife, apparently in the presence of their then three-year-old daughter Jammit.[1] He was convicted of two counts of felonious assault as a result of that incident, and of theft as a result of a separate incident. In November, the court imposed concurrent three to fifteen year sentences on Davis for the felonious assault convictions. It imposed a one-year sentence for the theft conviction, to be served consecutively to the sentences for the assault convictions.[2]
On March 4, 1998, Beth Davis, Jammit's mother, relinquished custody of Jammit because they were homeless. The court granted CSB emergency temporary custody. Jammit was later adjudicated dependent and placed in the temporary custody of CSB. On January 29, 1999, CSB requested permanent custody of Jammit premised on her mother's inconsistent contact, chronic mental or emotional illness, and failure to rectify the conditions that required the child's initial removal, and also on her father's incarceration. At the time of its motion, CSB did not expect Davis to be released for more than eighteen months.
On February 25, Davis was served with notice of the permanent custody hearing on May 6. The notice informed him of the date and time of the hearing and of his right to appointed counsel. It also ordered him to appear at the hearing. Davis acknowledged receipt of the notice in a letter received by the court on March 5. The letter also indicated that attorney David Lowrey was representing Davis. On April 20, following a pretrial conference, the court again served notice on Davis that the "Permanent Custody Trial" was "set for Trial May 6, 1999, at 8:30 a.m."
On April 27, CSB requested a six-month extension of temporary custody in order to explore the possibility of placing Jammit with a relative. In addition, CSB notified the court that it had become aware that Davis might be released from prison by May 10, 1999. In its pretrial statement, filed the same day and also served on Davis, CSB continued to "[request] permanent custody of Jammit Davis, however in the alternative CSB has filed a motion requesting a six-month extension due to the recent appearance of relatives for [possible] legal custody."
On April 29, during a counseling session, Jammit told her counselor that she witnessed the 1996 attack on her mother by Davis. Jammit would have been three years and three months old at the time of the attack. According to an informal transcript of a portion of that counseling session, after her mother was stabbed, Jammit attempted to get the police to come help her mother. During the same counseling session Jammit also told her counselor that her father frequently beat her with a belt and with the electrical cord attached to their iron, before he was incarcerated in 1996. A few days before the attack on her mother, Davis tore one of Jammit's ponytails out of her scalp.[3] This information was conveyed to Davis' attorney on May 5, 1999, and was presented at the permanent custody hearing.
Davis was not present at the permanent custody hearing on May 6. Davis' attorney was present at the hearing, and indicated that:
 I thought he got out on May 1, 1999 and that he would have contacted me, et cetera. In fact I'm looking here in this * * * information from the Ohio Department of Rehabilitation and Corrections which indicates that his expected release date was May 1, 1999. As a result of that, I didn't file a motion or an order to have him here, because it was my perception that he was going to be out and he would be able to make himself available.
 Davis' attorney indicated that he didn't "have a problem going forward today." He requested that "the door be open if [Davis] wants to come in and make a statement * * * in the next week or so or ten days." [4] He made the request because Davis was not present at the hearing and because Davis' counsel did not receive the damaging information from Jammit's counselors until May 5. Davis did not contact the court between the hearing on May 6 and the judgment that granted CSB permanent custody on May 17.
 II
Davis has asserted that "the trial court erred in denying appellant his constitutional due process right to be heard before it terminated his parental rights." Citing Luff v. Ohio (1927),117 Ohio St. 102, paragraph four of the syllabus, Davis has argued that the process by which his parental rights were terminated did not provide him with the "essential rights of notice, and an opportunity to be heard."
Davis was given more than two months' notice that his parental rights might be terminated as the result of a hearing on May 6, 1999. He acknowledged receipt of that notice. A little more than a week before the hearing, the state moved for a six-month extension of temporary custody. In a separate document, served on Davis the same day, CSB reasserted its motion for permanent custody and described the request for a six-month extension as a motion "in the alternative." Although CSB did, for a brief period, request an extension of temporary custody, it never withdrew its motion for permanent custody. Davis had ample notice that his parental rights might be terminated as a result of the May 6, 1999 hearing. His assertion that he was denied notice is without merit.
The record contains no information about when, or if, Davis was released from prison. According to Davis' attorney, Davis was to have been released from prison five days before the hearing. According to CSB, it expected Davis to be released four days after the hearing.
If Davis was no longer incarcerated on the date of the permanent custody hearing, the state provided an opportunity for Davis to be heard. Davis chose not to take advantage of the opportunity. If, on the other hand, Davis remained incarcerated on the date of the hearing, he still made no attempt to take advantage of the opportunity the state provided for him to be heard. Despite notification that his parental rights might be terminated, Davis did not ask to be transported to the hearing, did not asked to be deposed in anticipation of the hearing, did not communicate his whereabouts to his attorney, and did not attend the hearing. Davis' attorney, on his behalf, specifically consented to the proceedings going forward in Davis' absence.
As a means of permitting Davis to speak to the court about accusations that Jammit had made against him seven days before the hearing, Davis' attorney requested that the decision be held open for a week to ten days. Although the court did not formally grant the request by Davis' attorney, the decision was, in fact, delayed for eleven days. The record does not contain any interim filings by Davis, or his attorney, in response to the allegations, nor does it contain a request for additional time to respond.
Whether Davis remained incarcerated or not, the record does not demonstrate that the state created any impediments to his attendance at the hearing. Nor does it demonstrate that the state prevented him from addressing the court after the hearing, during the delay his attorney requested so that he might address the court. The permanent custody hearing provided an opportunity for Davis to be heard. It was Davis' own actions, rather than those of the state, that prevented him from being heard.
 III
Davis' assignment of error is overruled because the record does not support his contention that he was not given notice and an opportunity to be heard by the court before it terminated his parental rights. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant. Exceptions.
 ________________________________ WILLIAM R. BAIRD, FOR THE COURT.
SLABY, J. and WHITMORE, J. CONCUR.
[1] The record does not contain the precise date of the assault. The arrest warrant for the assault, and a motion for a Temporary Protective Order were issued on March 5, 1996.
[2] On October 27, 1995, Davis pled guilty to, and was convicted of, drug abuse for which he received a one year suspended sentence. The sentence for this drug abuse conviction does not appear to have increased his potential period of incarceration.
[3] CSB testified that this incident resulted in a substantiated referral of abuse on February 26, 1996.
[4] In closing, Davis' attorney requested "a period of time to determine Mr. Davis' whereabouts." He also indicated that "it's appropriate for myself to have a little bit of time to get him in here so that he can address these allegations." Neither of these later requests is in conflict with his earlier specific request for a week to ten days' delay. In addition, Davis' attorney suggested permitting Davis to work on his "goal plans and his objectives" or permitting a continuance "in order for CSB to thoroughly review [Davis' half-sister] to see if it's a legitimate, viable placement." Neither of these requests is relevant to the argument made by Davis, that he was denied notice and the opportunity to be heard before his parental rights were terminated.